_____
                                              )
RACHEL BERNSTEIN, *et al.*,                   )
                                              )
        Plaintiffs,                           )
                                              )
        v.                                    )        Civil Action No. 12-1906 (ESH)
                                              )
JOHN F. KERRY, *et al.*,[1]                   )
                                              )
        Defendants.                           )
_____       )

## MEMORANDUM OPINION

Plaintiffs Rachel Bernstein and other American citizens who live in Israel have filed suit

against the Secretary of State and other government officials claiming that defendants have

violated the law by providing money and other resources to the Palestinian Authority and other

non-governmental groups in the West Bank and Gaza without following statutory requirements.

(Complaint, Nov. 26, 2012 [ECF No. 1] ("Compl.") ¶¶ 1-5.)  Defendants have moved to dismiss

for lack of jurisdiction.  (Motion to Dismiss, Apr. 1, 2013 [ECF. No. 15].)  For the reasons stated

herein, this Court will grant defendants' motion on the grounds of lack of standing.

## BACKGROUND

Plaintiffs are twenty-four American citizens who reside in Israel, two of whom have been

injured in terrorist attacks in Jerusalem.  (Compl. ¶¶ 10-33.)  Plaintiffs "live in fear of Palestinian

terrorist attacks" and allege that defendants have failed to comply with a variety of statutes that

were enacted for the "purpose of protecting the Plaintiffs and others similarly situated."  (*Id.*

¶¶ 34-36.)  Among the statutes at issue, plaintiffs claim that defendants have violated the

_____

[1] Pursuant to Fed. R. Civ. P. 25(d), if a public officer named as a party to an action in his official
capacity ceases to hold office, the Court will automatically substitute that officer's successor.
Accordingly, the Court substitutes John F. Kerry for Hillary R. Clinton.

Department of State, Foreign Operations, and Related Programs Appropriations Act of 2012

("SFOAA"), Pub. L. No. 112-74, 125 Stat. 786.  Section 7036 of SFOAA provides that funds

may not be used to support a Palestinian state unless the Secretary of State determines and

certifies to the appropriate congressional committee that:

> (1) the governing entity of a new Palestinian state--
>> (A) has demonstrated a firm commitment to peaceful co-existence with the State of Israel;
>> (B) is taking appropriate measures to counter terrorism and terrorist financing in the West Bank and Gaza, including the dismantling of terrorist infrastructures, and is cooperating with appropriate Israeli and other appropriate security organizations; and
>
> (2) the Palestinian Authority (or the governing entity of a new Palestinian state) is working with other countries in the region to vigorously pursue efforts to establish a just, lasting, and comprehensive peace in the Middle East that will enable Israel and an independent Palestinian state to exist within the context of full and normal relationships, which should include--
>> (A) termination of all claims or states of belligerency;
>> (B) respect for and acknowledgment of the sovereignty, territorial integrity, and political independence of every state in the area through measures including the establishment of demilitarized zones;
>> (C) their right to live in peace within secure and recognized boundaries free from threats or acts of force;
>> (D) freedom of navigation through international waterways in the area; and
>> (E) a framework for achieving a just settlement of the refugee problem.

*Id.* § 7036(a).  Section 7039 prohibits assistance under the West Bank and Gaza Program to be

"made available for the purpose of recognizing or otherwise honoring individuals who commit,

or have committed acts of terrorism."  *Id.* § 7039(c).  Section 7040 prohibits funds to be provided

to the Palestinian Authority unless the President certifies that the waiving of the prohibition "is

important to the national security interests of the United States."  *Id.* §§ 7040(a), (b).  The

President exercised this waiver in 2012, and "certif[ied] that it is important to the national

security interests of the United States to waive the [prohibition] in order to provide funds . . . to

the Palestinian Authority."  Pres. Determ. No. 2012-07, 77 Fed. Reg. 33,947 (Apr. 25, 2012).  As

part of the certification, President Obama directed the Secretary of State to file a report with the

Committee on Appropriations in compliance with § 7040(d) of SFOAA. *See id.* Such a report

must detail "the justification for the waiver, the purposes for which the funds will be spent," and

"the steps the Palestinian Authority has taken to arrest terrorists, confiscate weapons and

dismantle the terrorist infrastructure." SFOAA § 7040(d). While plaintiffs claim not to have

seen this report, they nonetheless allege that the Secretary of State "could not have certified, in

good faith, as required by § 7040(d), because the Palestinian Authority has not taken meaningful

steps to arrest terrorists, confiscate weapons, or dismantle the terrorist infrastructure." (Compl.

¶¶ 115-16.)

In addition, plaintiffs claim that defendants have violated various other provisions of

SFOAA,[2] criminal statutes prohibiting the provision of material support to a foreign terrorist

organization,[3] and other laws[4] prohibiting funding of the Palestinian Authority ("PLO"), the

Palestinian Liberation Organization ("PLO"), and the United Nations Relief and Works Agency

for Palestine Refugees ("UNRWA") in the absence of a valid Presidential waiver and/or

congressional certification by the Secretary of State.[5]

---

[2] (*See, e.g.*, Compl. ¶¶ 118-25 (discussing § 7040(f), which prohibits funding of Hamas, any entity controlled by Hamas, and any power-sharing government of which Hamas is a member unless the President files the required certification with the Committee on Appropriations).)

[3] (*See* Compl. ¶¶ 164-82 (discussing 18 U.S.C. §§ 2339A, 2339B).)

[4] (*See* Compl. ¶¶ 183-84 (discussing 22 U.S.C. § 2221(c)), 185-87 (discussing 22 U.S.C. § 2227), 301 (discussing 22 U.S.C. § 2378b), 306 (discussing 22 U.S.C. § 2378c), 311 (discussing 22 U.S.C. § 5202).)

[5] In particular, plaintiffs claim that "[u]pon information and belief," the State Department allocated nearly $200 million from the Economic Support Fund to the Palestinian Authority in 2012 (Compl. ¶ 47), and that USAID provides money "to actors in the West Bank and Gaza who support terrorism or who are terrorists." (*Id.* ¶ 57.)

In sum, plaintiffs have sued under various civil and criminal statutes based on their belief

that the foreign aid given to the Palestinian Authority and non-governmental organizations in the

West Bank and Gaza violates the law, that this money is in turn used to finance terrorism, and

that defendants have a "nondiscretionary duty" to cease providing these funds and to comply

with federal laws. On this basis, plaintiffs invoke the Court's mandamus jurisdiction under 28

U.S.C. § 1361 to compel defendants to comply with federal statutes, to take measures to prevent

the diversion of federal funds to support terrorism, to seek recovery of funds provided without

authority and to enjoin defendants from funding the Palestinian Authority, UNRWA, and others

in the West Bank and Gaza "until those actors are ready and able to fully comply with federal

prohibitions against support for terrorism." (Compl. at 57 (Request for Relief).)

Defendants have moved to dismiss for lack of jurisdiction on the grounds that plaintiffs

lack Article III standing, that the political question doctrine bars relief, and that plaintiffs have no

clear right to relief under the Mandamus Act, 28 U.S.C. § 1361. Plaintiffs have opposed this

motion, arguing that they have standing, that "Defendants' Political Question Argument is

Frivolous," that the Court must enforce the plain text of the "Federal Appropriations Statutes

Against Executive Abuses," and that "Palestinian Terrorism is a Daily Threat that Relies on a

Constant Supply of Money." (*See* Plaintiffs' Opposition to Defendants' Motion to Dismiss, June

14, 2013 [ECF No. 19] ("Opp'n") at i.) Whether plaintiffs are factually correct that terrorism is a

daily threat is not at issue, for plaintiffs' complaint is legally flawed in several important

respects.[6] The Court, however, is satisfied that none of the plaintiffs has standing and therefore

---

[6] The Court disagrees with plaintiffs' arguments that it is frivolous to argue that this case presents non-justiciable political questions and that the Court lacks the power under its mandamus power to enjoin the Executive from providing foreign aid that arguably does not comport with various statutory requirements. Contrary to plaintiffs' argument, this is hardly a straightforward question of statutory interpretation. Moreover, as the Circuit held in *Lin v. United States*, even if the

this case is non-justiciable under Article III of the Constitution.  *See Am. Jewish Cong. v. Vance*, 575 F.2d 939, 943 (D.C. Cir. 1978) (when both standing and political question issues are before the Court, it is more prudent to determine the question of standing first).

**ANALYSIS**

Plaintiffs bear the burden of establishing that the Court has jurisdiction to hear their claims.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998).  However, a court considering a 12(b)(1) motion to dismiss "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  "While the burden of production to establish standing is more relaxed at the pleading stage than at summary judgment, a plaintiff must nonetheless allege 'general factual allegations of injury resulting from the defendant's conduct.'"  *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011).

The Supreme Court has made clear that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation omitted).  Standing is a core component of the case-or-controversy requirement, and it "serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013).  "[T]o establish constitutional standing, plaintiffs must satisfy three elements: (1) they must have suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) the injury must be 'fairly traceable to the challenged action of

---

Court could resolve a case through statutory analysis, which is doubtful here, the Court would decline to do so since this case is fraught with serious political questions that deprive the Court of jurisdiction.  561 F.3d 502, 506 (D.C. Cir. 2009).  But, as noted, it need not reach these claims since the lack of standing is clear.

the defendant'; and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Where a plaintiff is seeking declaratory or injunctive relief, he "must show he is suffering an ongoing injury or faces an immediate threat of injury." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).

## I.     INJURY-IN-FACT

Plaintiffs argue that they have suffered injury-in-fact because they live in constant fear that their lives and livelihood are at risk, or alternatively, because defendants have violated their statutory rights. (Opp'n at 13-16, 18-19.) In regards to the first claim, plaintiffs compare their fear to that of a victim being stalked, and argue that because stalking is illegal, the fear of stalking should be viewed as an injury-in-fact. (*Id.* at 14-15.) While this analogy could well be apt, plaintiffs have no legal support for the view that a subjective emotional response to the possibility of an invasion of a legally-protected interest constitutes an injury-in-fact. On the contrary, there are a host of cases which hold just the opposite. *See, e.g.*, *Clapper*, 133 S. Ct. at 1152-53 (holding that a "subjective fear of surveillance does not give rise to standing"); *J. Roderick MacArthur Found. v. F.B.I.*, 102 F.3d 600, 606 (D.C. Cir. 1996) ("It is not enough for the Foundation to assert that it might suffer an injury in the future, or even that it is likely to suffer an injury at some unknown future time. Such 'someday' injuries are insufficient.").

This Court has previously ruled that the specific fear arising from a foreign policy, no matter how severe a plaintiff's disagreement with that foreign policy may be, cannot constitute injury-in-fact without a concrete harm. For instance, in *Mahorner v. Bush*, plaintiff alleged that the President's decision to initiate war in Iraq constituted a major threat that plaintiff would lose

6

his life in the military response.  224 F. Supp. 2d 48, 50 (D.D.C. 2002), *aff'd*, 2003 WL 349713, at *1 (D.C. Cir. 2003).  The Court, in holding that plaintiff did not have standing, found that "plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur." *Id. Mahorner* is strikingly similar to this case.  Plaintiffs allege that the actions of the Executive have injured them by creating a fear of bodily harm, but they too cannot be granted standing without an impending, concrete injury.

Plaintiffs' reliance on *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973) ("*SCRAP*"), is also misplaced, as the injury-in-fact in that case was not an emotional response to the risk of the loss of access to natural resources, but instead, it was a U.S. policy that was claimed would actually cause plaintiffs to lose such access. *Id.* at 685-87.  More to the point is the Supreme Court's recent opinion in *Clapper*, where the Court observed that if a plaintiff were able to create standing by merely incurring costs as a result of a "nonparanoid fear," any "enterprising plaintiff would be able to secure a lower standard for Article III standing." *See Clapper*, 133 S. Ct. at 1151.  The Court similarly held in *City of Los Angeles v. Lyons* that "it is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." 461 U.S. 95, 107 (1983).  Put simply, the injury plaintiffs allege is "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending'" to create standing. *Clapper*, 133 S. Ct. at 1143.  Plaintiffs have therefore not shown an injury-in-fact.

In addition to fear-based injury, plaintiffs assert an alternative theory:  "[p]laintiffs have been injured via the violation of their legal right to be free of the threat of terrorists funded by their government, at least to the extent provided by the statutes identified in the Complaint."

(Opp'n at 18.)  This alternative theory fares no better than plaintiffs' fear-based injury.  As

explained by the Supreme Court, standing cannot be based on plaintiffs' interest, common

among all citizens, in the government following the law.  *Valley Forge Christian Coll. v.*

*Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982).  Instead,

plaintiffs must show an actual injury that has been caused by the government's failure to follow

the law.

      In *Aerotrade, Inc. v. Agency for Int'l Dev., Dep't of State*, plaintiff argued that the

President must cease funding to Haiti, despite the fact that the President had determined that

continuing to give aid was in the interest of national security.  387 F. Supp. 974, 975 (D.D.C.

1974).  The Court found that "*[a]t most*, then, plaintiff can only ask that the President be

required to inform the Congress of his reasons for not deciding to suspend foreign aid to Haiti."

*Id.* at 975-76 (emphasis added).  But despite this statutory requirement, the Court found that

plaintiffs lacked standing because the plaintiff did not have a direct interest in this reporting

requirement:

> In [*United States v.*] *Richardson*, [418 U.S. 166 (1974),] a federal taxpayer
> challenged the failure of the C.I.A. to make a public accounting of its use of
> public funds as required by Art. I, § 9, cl. 7 of the Constitution. The Supreme
> Court held he lacked standing to litigate this issue which was "committed to the
> surveillance of Congress, and ultimately to the political process." [*Id.* at 179]. In
> the same way that the plaintiff in *Richardson* lacked standing to force the C.I.A.
> to make its budget available for public scrutiny, so the plaintiff here cannot show
> a judicially cognizable injury arising out of the failure of the President to report
> his reasoning to Congress. As in *Richardson*, the plaintiff here must look to
> Congress and the political process, not this Court, to compel the President to
> make public the reasons for his action.

*Id.* at 976.  Here too, the statutory limitations on funding that Congress has provided for are for

Congress and the political process to oversee.  Plaintiffs have therefore not shown how the

alleged failure of defendants to follow specific provisions of the statute has resulted in a concrete

or surely impending harm.

## II. CAUSATION

Plaintiffs also fail to show that their fear is fairly traceable to defendants' foreign assistance to the Palestinian Authority and to non-governmental organizations in the West Bank and Gaza. *Clapper* made clear that the Court would not "endorse standing theories that rest on speculation about the decisions of independent actors." 133 S. Ct. at 1150; *see also id.* at 1150 n.5 ("[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm."); *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (to confer standing, "the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"). To trace the alleged injury in this case to the challenged actions of defendants, this Court would have to speculate on whether defendants' funding policies were in fact aiding terrorists, whether the terrorists were using these funds for activities intended to harm plaintiffs, and whether these activities are leading to a "certainly impending" injury for plaintiffs. As this Court has held, "[s]uch a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts" to the alleged injury. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).

Plaintiffs attempt to argue that there is a correlation between the provision of federal funds and the acts of Palestinian terrorism. (*See* Opp'n at 31-38.) However, the charts that plaintiffs rely on do not address U.S. foreign aid specifically (as opposed to international foreign support), and plaintiffs conflate the concept of correlation with causation. And, plaintiffs' theory would depend on proof that the Palestinian Authority is directly linked to terrorist organizations

9

and that the aid provided by the U.S. is being funneled directly to recognized terrorist

organizations. (*See id.* at 32 n.16.) Of course, these allegations are far beyond the Court's

jurisdiction. *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)

("[T]he very nature of executive decisions as to foreign policy is political, not judicial. . . . They

are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility

and have long been held to belong in the domain of political power not subject to judicial

intrusion or inquiry."). For this reason, as well as others, plaintiffs' prediction that they will

ultimately prove these allegations at trial (*see* Opp'n at 32 n.16) does not remedy the glaring

deficiencies in plaintiffs' claim of causation.

## III.    REDRESSABILITY

Plaintiffs also fail to satisfy the third prong of the standing inquiry, for plaintiffs cannot

demonstrate an injury redressable by the relief they request. It must be "'likely,' as opposed to

merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504

U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). It is

nothing more than conjecture to argue that changing U.S. funding policies will reduce terrorism

or plaintiffs' subjective fears. U.S. government support for the Palestinian Authority and

Palestinian people is intended to promote the Authority's fiscal viability, strengthen public

institutions, develop the Authority's capacity to provide security, foster private-sector growth,

and meet humanitarian needs. (Mot. Ex. A, Congressional Budget Justification [ECF No. 15-2]

at 564.) Plaintiffs obviously disagree with the government's policies in this regard, but as noted

by the Supreme Court in *Allen v. Wright*:

> The idea of separation of powers that underlies standing doctrine explains why
> our cases preclude the conclusion that respondents' alleged injury [from
> desegregation of respondents' schools] fairly can be traced to the challenged
> action of the IRS [granting a tax exemption]. . . . Carried to its logical end,

[respondents'] approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action.

468 U.S. 737, 759-60 (1984) (internal quotation marks and citations omitted).

The Executive Branch has decided that the provision of foreign aid encourages the peace process and reduces the risk of terrorism. Plaintiffs' disagreement with this policy and their belief that a change in policy would reduce the threat of terrorism is, at best, mere speculation. *See Talenti v. Clinton*, 102 F.3d 573, 575-78 (D.C. Cir. 1996) (plaintiff lacked standing to require the government to withhold assistance from Italy under statute prohibiting assistance to governments that had expropriated U.S. persons' property because President could waive the prohibition and "[e]ven the improbable scenario of a decision to withhold assistance from Italy does not redress Talenti's injury" due to uncertainty about how Italy would react); *Aerotrade*, 387 F. Supp. at 975-76 (plaintiff lacked standing to direct that all assistance to Haiti be terminated pursuant to a provision that prohibited assistance to any government that repudiates a contract with a U.S. citizen because President could waive the prohibition and there was "considerable uncertainty as to whether [an assistance cutoff] would aid plaintiff in collecting its debt or would tend to drive Haiti into even greater intransigence").

## CONCLUSION

In sum, plaintiffs have not shown injury, causation, or redressability. They thus have no standing, and their suit will be dismissed for a lack of jurisdiction. A separate Order accompanies this Memorandum Opinion.

/s/<br>
ELLEN SEGAL HUVELLE<br>
United States District Judge

DATE: August 26, 2013